## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 15-60007 |
| WINLAND OCEAN SHIPPING | § | (Joint Administration Requested) |
| CORPORATION, | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | Case No. 15-60008 |
| SKYACE GROUP LTD. (BVI), | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | Case No. 15-60009 |
| PLENTIMILLION GROUP LTD. (BVI), | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | Case No. 15-60010 |
| FON TAI SHIPPING CO., LTD. (HK), | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | Case No. 15-60011 |
| WINLAND DALIAN SHIPPING S.A. | § | |
| (PANAMA), | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| | § | Case No. 15-60012 |
| WON LEE SHIPPING CO., LTD. (HK), | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## DECLARATION OF ROBERT E. OGLE IN SUPPORT OF
## DEBTORS' VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF THE
## UNITED STATES CODE AND FIRST DAY MOTIONS

I, Robert E. Ogle state as follows:

## I.  **INTRODUCTION**

1.      I am the Chief Restructuring Officer of Winland Ocean Shipping Corporation ("Winland");  SkyAce Group Limited ("SkyAce"); Plentimillion Group Limited ("Plentimillion"); Fon Tai Shipping Co. Ltd. ("Fon Tai"); Winland Dalian Shipping S.A. ("Winland Dalian"); and Won Lee Shipping Co. Ltd. ("Won Lee," and together with Winland, Fon Tai, Plentimillion, SkyAce, and Winland Dalian, collectively, the "Debtors"). The Debtors are involved in the international ocean transportation of bulk cargo.  Winland, a Texas corporation, owns 100% of SkyAce, SkyAce owns 100% of Plentimillion, and Plentimillion owns 100% of each of the remaining three debtors—Fon Tai, Winlan Dalian, and Won Lee.  Fon Tai owns the vessel "M.V. Fon Tai."  Winland Dalian owns the vessel "M.V. Winland Dalian," which was arrested by a Chinese Court in December 2014.[1]  Won Lee owns the vessel "M.V. Rui Lee," which was arrested by a Singapore Court in September 2014. [2]

2.      As a result of these arrests, only one of the Debtors' three ships is currently operating.  If the M.V. Rui Lee could be released and the M.V. Winland Dalian could have its repairs completed and be released, then these two vessels could immediately begin to earn money for the Debtors, which would improve their financial condition to the benefit of all creditors.  Regarding their areas of operation, the M.V. Winland Dalian and M.V. Rui Lee have had ports of call in several countries around the world, including Saudi Arabia, India, Indonesia, and South Korea.[3]

---

[1]      Photographs of the MV Winland Dalian and M.V. Rui Lee are attached as Exhibit A.

[2]      The Debtors' corporate structure is identified in the attached Exhibit B, which also identifies other non-debtor entities.

[3]      A map identifying relevant locations, including ports of call, is attached as Exhibit C.

3.      On November 15, 2014, I was retained prepetition by the Debtors to assist with the evaluation of debt restructuring options.  In that capacity, I have become familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I have personal knowledge of Winland's activities in Texas.  Until as recently as 2012, Winland was a publicly traded company and filed financial records with the SEC, including 10-Ks and 10-Qs.  Winland maintains a bank account with a Wells Fargo branch located in Victoria, Texas.  This bank account has a balance of approximately $20,000, and Winland intends to convert this account to a debtor-in-possession bank account after filing its bankruptcy petition.  In addition, Winland has provided retainers to my firm's Houston office and to the law firm of Okin & Adams, which also is located in Houston.

4.      I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "Bankruptcy Cases") and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First Day Motions").[4]

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management and advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

---

[4]      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motions.

6.     This Declaration is intended to provide a summary overview of the Debtors and the Bankruptcy Cases.  This Declaration describes the Debtors' business, capital structure and material obligations, the events which precipitated the Bankruptcy Cases, and summarizes the First Day Motions supported by this Declaration.

## II.     BACKGROUND

### 1.  The Debtors' Business

7.     The Debtors are engaged in the business of international ocean transportation of bulk cargo.  At the height of their operations in 2011 and 2012, the Debtors had an ocean shipping fleet of 11 vessels, with a self-owned carrying capacity of over 240,000 tons; through monthly voyage charters and time charters, the Debtors provided service to major ports around the world.

8.     The business was founded as a chartering business in 1993 by Li Honglin ("Li) and his wife, Xue Yinghe ("Xue").  At the time, the market in China was dominated by State-owned enterprises and the level of service was generally not satisfying to customers.  As a privately owned business, Li and Xue made effective use of their advantages in service and price to build relationships with a large number of corporate customers.  Through a gradual accumulation of capital and experience, as well as a grasp of market trends, the company leased its first vessel in 1995.   In 1997, following the outbreak of the Southeast Asian financial crisis, the global shipping market experienced a downturn.  With an optimistic view of market prospects and stable customer base, the Debtors seized the opportunity to lease more vessels at a lower price, becoming a ship owner by the direct purchase of vessels in 1998.  Between 2000 and 2005, the Debtors purchased a total of 13 vessels. The Company purchased one in 2009, and

constructed two new vessels in 2010 (one delivered in January 2011 and the other delivered in May 2011).

9.    The Debtors and other subsidiaries generated revenue of $85.6 million and net income of $19.1 million in 2008. With the global economic crisis and shipping market downturn since late 2008, operating revenues in 2009 dropped to $50.2 million producing a net loss of $7.0 million. Operating revenues and net income improved in 2010 to $74.3 million and $3.1 million, respectively. For the fiscal year ended December 31, 2011, operating revenues and net income were $60.8 million and $3.1 million, respectively.

10.   Operating revenues and net income took a turn downward for the fiscal years 2012 through 2014.  The fiscal year ending December 31, 2012, had operating revenue of $56.4 million and a net loss of $7.3 million  The fiscal year ending December 31, 2013 had operating revenue of $35.1 million and a net loss of $2.9 million.  The fiscal year ending December 31, 2014 had operating revenue of $12.6 million and a net loss of $8.0 million.

11.   In 2011, the Debtors and other subsidiaries began selling off vessels in their fleet. In 2013 and 2014, nine vessels were sold ranging in price from approximately $870,000 to $1.8 million.  The proceeds from these sales were used to settle outstanding secured debt on the vessels as well as trade debt for spare parts, stores, agency fees, and bunker charges.

12.   The shipping industry is highly cyclical, with attendant volatility in charter hire rates and profitability. Following record charter rate levels in 2007 and 2008, charter rates in many sectors of shipping quickly plummeted to decade-low levels as a result of the global recession. As noted above, during the years leading up to the global recession, the Debtors were in the process of initiating an expansion of fleet, which included placing orders with a shipyard for two new vessels.  However, under the pressure of extremely low charter rates for its existing

vessels, the Debtors have faced difficulty in servicing their debt and operating expenses.  The recent arrest of two of their vessels and the resulting loss of charter income has exacerbated the situation.

13.     On or about September 9, 2014, the "M.V. Rui Lee" was arrested by Milestone Shipping, S.A. ("Milestone") in Singapore pursuant to a Warrant of Arrest issued in the action Milestone Shipping, S.A. v. Owner of the Vessel Rui Lee, Case No. ADM 103/2014 (the "Milestone Action"), in the High Court of the Republic of Singapore.  The Milestone Action includes allegations of breach of contract, breach of duty, negligence and tort claims stemming from the charter of the M.V. Rui Lee from the Persian Gulf to China on or about March 5, 2014 and the carriage of certain iron ore cargo that allegedly resulted in loss, damage, non-delivery and/or delays.

14.     In order to protect its interest, China Merchants Bank Co. Ltd. ("CMB"), intervened in the Milestone Action on September 11, 2014, and filed an action in the High Court of the Republic of Singapore against the Debtor Won Lee, as the owner of the vessel, Case No. ADM 162/2014 (the "CMB Action") for failure to make payments when due on the outstanding loan secured by the M.V. Rui Lee, and is requesting, among other things, payment of all amounts due under the loan.

15.     In connection with the CMB Action, a hearing regarding a summary judgment motion was scheduled before an Assistant Registrar on February 12, 2015.  This hearing took place but was not completed and has been rescheduled for February 27, 2015.  A separate hearing regarding an application to sell the M.V. Rui Lee is scheduled before the High Court of the Republic of Singapore for February 17, 2015.   If CMB is successful at the sales application hearing, the vessel will be appraised and posted for sale. As a result of the arrest of the M.V. Rui

Lee, for the last several months this vessel has not been able to generate income critical to the Debtors.

16.     On or about December 15, 2014, the "M.V. Winland Dalian" was in the port of Ningde in Fujian Province at Fujian Xinyuan Shipbuilding Co., Ltd. to complete necessary repairs when it was arrested.  The "M.V. Winland Dalian" was arrested pursuant to a Civil Ruling and Arrest Order issued by the Xiamen Maritime Court.  The Applicant of this Arrest Order was Grand Capital International Limited ("GCIL"), which is a BVI registered company located in Taiwan.  GCIL requested the Arrest Order because Winland Dalian could not repay the debt related to its purchase of the "MV Winland Dalian."

17.     As a result of the arrest of the M.V. Winland Dalian, it has not been able to generate income critical to the Debtors.  If the repairs on the M.V. Winland Dalian were completed, and the M.V. Winland Dalian were released, it could immediately begin to generate necessary income.

18.     The arrest of two of the Debtors' three vessels has made the Debtors' financial condition even more precarious and has significantly impaired the Debtors' ability to operate.  If the M.V. Rui Lee could be released and the M.V. Winland Dalian could have its repairs completed and be released, then these two vessels could immediately begin to earn money for the Debtors, which would improve their financial condition to the benefit of all creditors.

**2.   The Corporate Structure and Ownership of the Debtors**

19.     Winland is a Texas corporation, and was a publicly traded company filing financial reports with the SEC until August 14, 2012, when Winland terminated the registration of its common stock pursuant to SEC Rule 12g-4 (17 C.F.R. § 240.12g-4) by filing SEC Form 15.  Winland, therefore, no longer files reports with the Securities and Exchange Commission.

Winland, however, maintains a bank account with a Wells Fargo branch office in Victoria, Texas. Winland intends to convert this account to a debtor-in-possession bank account after filing its bankruptcy petition. In addition, Winland has provided retainers to my firm's Houston office and to the law firm of Okin & Adams, which also is located in Houston.

20.    Through its direct and indirect subsidiaries Winland currently owns three vessels: (i) "M.V. Fon Tai" owned by the Debtor Fon Tai; (ii) "M.V. Rui Lee" owned by the Debtor Won Lee; and (iii) "M.V. Winland Dalian" owned by the Debtor Winland Dalian.[5] The Debtors, through their affiliates, collect funds from customers and pay all expenses related to the vessels. An unaffiliated company, Dalian Master Well Ship Management Co., Ltd., manages all of the vessels. On August 12, 2008, by a share exchange transaction, Winland (which was then known as Trip Tech, Inc.) acquired all of the issued and outstanding securities of SkyAce from Pioneer Creation Holdings Limited ("Pioneer").[6] More than 82.5% of Winland's common stock is held by Pioneer and controlled by Li and Xue; the balance is held by fewer than 12 record holders.[7]

21.    SkyAce is a holding company that was organized in the British Virgin Islands on September 22, 2006. SkyAce was formed solely for the purpose of acquiring Plentimillion and Best Summit Enterprise Limited ("Best Summit") from Li and Xue, each of whom had owned fifty percent (50%) of the stock of both Plentimillion and Best Summit. In 2011, SkyAce sold

---

[5]    The M.V. Fon Tai, the M.V. Rui Lee and M.V. Winland Dalian are hereinafter collectively referred to as the "Vessels."

[6]    In this share exchange, Winland acquired all of the issued and outstanding securities of SkyAce from Pioneer in exchange for 76,925,000 shares of Winland's common stock and 1,000,000 shares of Series A Preferred Stock which preferred shares were convertible into (and subsequently were converted into) 30,000,000 shares of common stock. In March, 2011, Winland effected a 1.5 for 1 forward stock split of its common stock to shareholders of record as of March 25, 2011, increasing the total issued and outstanding number of shares of common stock to 195,000,000 shares. As a result, the common shares held by Pioneer were converted into an aggregate 160,387,500 shares of Winland common stock.

[7]    The common stock of Winland had been quoted on the Over the Counter Bulletin Board's OTCQB market under the symbol "WLOL".

Best Summit but still owns all of the outstanding stock of Plentimillion.  SkyAce, which is a wholly-owned subsidiary of Winland, has no significant business operations other than the ownership of Plentimillion.

22.     Plentimillion is a holding company that was organized in the British Virgin Islands on July 5, 2006.  Its wholly-owned subsidiaries, Fon Tai, Won Lee, and Winland Dalian, each owns one of the Vessels and derives income from shipping charters.  The Vessels are operated by these Debtors, but those operations are managed by Dalian Master Well Ship Management Co. Ltd., a Chinese company whose principal activities include shipping agency services, booking cargo space, storage of goods and processing customs declarations.[8]

**3.  Secured Debt**

        (i)     Loan Facility from China Merchants Bank

23.     The Debtors' acquisition of two of the Vessels— M.V. Fon Tai and M.V. Rui Lee — was partially financed with funds loaned by CMB.  By a certain facility agreement dated March 26, 2010 (together with all amendments and supplements to it, the "CMB Facility"), made by and among CMB, as lender, Fon Tai and Won Lee, as joint and several borrowers, SkyAce, as corporate guarantor, and Li and Xue as individual guarantors, CMB made available to Fon Tai and Won Lee a secured loan facility of $37 million for the finance and construction of M.V. Fon Tai and M.V. Rui Lee.  As of June 30, 2011, the Debtors drew down $37 million from the CMB Facility for the purpose of commencing the building of these two vessels.  Currently, there is approximately $25.9 million outstanding in principal plus accrued interest on the CMB Facility.

---

[8]     The Debtors' corporate structure is identified in the attached Exhibit B, which also identifies other non-debtor entities.

24.     Pursuant to separate Deeds of Charge dated March 26, 2010, Plentimillion granted CMB a charge on the entire issued share capital of Fon Tai and Won.

25.     As additional security for the CMB Facility, Fon Tai and Won Lee executed separate Deeds of Covenants and Hong Kong Ship Mortgages, dated January 10, 2011 and May 5, 2011, respectively, granting CMB first priority mortgages on the M.V. Rui Lee and M.V. Fon Tai (together, the "CMB Mortgages").

26.     As additional security for the CMB Facility Agreement, Won Lee and Fon Tai also executed and delivered to CMB certain separate General Assignments dated January 10, 2011 and May 5, 2011, respectively, assigning the charter proceeds, earnings, insurance proceeds, and requisition compensation payable in respect to the M.V. Rui Lee and M.V. Fon Tai.

27.     By virtue of these documents, CMB has (i) a mortgage lien on the M.V. Rui Lee and M.V. Fon Tai and (ii) a security interest in cash and receivables generated from the operation of the two vessels.

(ii)     Installment Sale Agreement with Grand Capital International Limited

28.     By a certain Installment Sale Agreement dated July 22, 2013 (as amended and modified, the "GCIL Agreement") made by and among GCIL, as the seller, and Winland Dalian, as the buyer, GCIL agreed to sell the M. V. Winland Dalian to Winland Dalian on a deferred payment basis at a purchase price of $4 million.  Li and a non-debtor affiliate, Dalian Winland Group Corporation, are jointly and severally liable for the Debtors' obligations under the GCIL Agreement, which has a current principal balance of $3.2 million plus accrued interest.

29.     To secure its obligations under the GCIL Agreement, Winland Dalian granted GCIL a first priority ship mortgage in the M.V. Winland Dalian by a Deed of Covenants, dated

July 29, 2011 (the "GCIL Mortgage," and together with the CMB Mortgages, the

Mortgages").

30.     As further security for the GCIL Agreement, Winland Dalian, as owner, and

Winland Shipping Company Limited, as bareboat charter, executed and delivered to GCIL that

certain General Assignment dated July 29, 2013, by which Winland Dalian collaterally assigned

to GCIL the proceeds and earnings of the M.V. Winland Dalian.

31.     By virtue of these documents, GCIL has (i) a mortgage lien on M.V. Winland

Dalian and (ii) a security interest in cash and receivables generated from the operation of the

vessel.

      (iii)     Mortgage to China CITIC BANK Co. Ltd.

32.     By separate mortgages (the "Second Mortgages") dated November 29, 2012, Fon

Tai and Won Lee granted mortgages on, respectively, the M.V. Fon Tai and M.V. Rui Lee to

China CITIC BANK Co. Ltd. ("CITIC") to secure credits of up to $15 million issued by CITIC

to these Debtors in the 36 month period beginning on November 29, 2012 and ending on

November 28, 2015.  These credits include, but are not limited to, loans, bills, letter of

undertaking and other financial accommodations.  The amount presently outstanding to CITIC is

principal of approximately $19.6 million plus accrued interest.

      (iv)     Unsecured Claims

33.     In addition to the secured debt described above, the Debtors have unsecured debt.

The significant unsecured obligations include:

      (A)     *Loan from Sea Carrier Shipping Co. Ltd.*

34.     Winland is currently indebted to Sea Carrier Shipping Co., Ltd.  ("Sea Carrier") in

the approximate principal amount of $3,000,000 plus accrued interest, which is the remaining

balance due on a loan made to Winland by Sea Carrier.  The loan, which was in the original

principal amount of $10,700,000, is secured by Li's pledge of 30,000,000 shares of Winland common stock.  Proceeds of this loan aggregating $7,700,000 were used to finance the construction and purchase of M.V. Fon Tai and M.V. Rui Lee; the remaining $3,000,000 were used to purchase M.V. Bao Shun, which has since been sold.[9]

(B)   <em>Loan from Rich Forth Investment Limited</em>

35.     On or about May 18, 2010, Plentimillion entered into that certain Assignment of Shipbuilding Contract, assuming the respective shipbuilding contracts for the vessels between Jiangsu Hangtong Ship Heavy Industry Co. Ltd. ("Jiangsu") and RFIL.  In connection with shipbuilding contracts, Plentimillion entered into that certain Disposition of Debt Agreement dated May 18, 2010, whereby Plentimillion agreed to pay an "assignment charge" in the amount of $2.45 million for the M.V. Rui Lee and  $4.3 million for the M.V. Fon Tai (collectively, the "RFIL Loans".  The amount presently outstanding under the RFLI is $3,361,300.00 in principal plus accrued interest relating to M.V. Fon Tai, and $2,016,600.00 in principal plus accrued interest relating to M. V. Rui Lee.

(v)     <u>Debt to Jiangsu Hangtong Ship Heavy Industry Co., Ltd.</u>

36.     Pursuant to separate settlement agreements, both dated April 29, 2014, Won Lee and Fon Tai are separately indebted to Jiangsu for the unpaid balance of the purchase price for M.V. Rui Lee and M.V. Fon Tai.

37.     The amount Won Lee owes Jiangsu regarding the M.V. Rui Lee is set forth in an April 29, 2014 Settlement Agreement and consists of $2,850,000 in principal and $168,836 in

---

[9]      The M.V. Bao Shun, a 2003 built handysize vessel (20,212 gross tonnage, 10,948 net tonnage), was acquired pursuant to a June 3, 2009, Memorandum of Agreement with Mario Shipping Corporation for a price of $20,700,000.

interest.  This amount has been reduced by payments Won Lee has made as required by the Settlement Agreement.

38.     The amount Fon Tai owes Jiangsu regarding the M.V. Fon Tai is set forth in an April 29, 2014 Settlement Agreement and consists of $2,170,000 in principal and $170,652 in interest.  This amount has been reduced by payments Fon Tai has made as required by the Settlement Agreement.

39.     The Won Lee Settlement Agreement and the Fon Tai Settlement Agreement are separately guaranteed by Li and a non-debtor affiliate, Winland Group Corporation.

### III.     THE CHAPTER 11 CASES

40.     On February 12, 2015, the ("Petition Date") the Debtors each filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Court").

41.     These filings were precipitated by the arrests of the MV Rui Lee and MV Fon Tai as described above. These cases are necessary to preserve the value of the Vessels for the benefit of all of the Debtors' creditors and avoid the piecemeal dismemberment of the Debtors' business.

42.     The Debtors hope to re-structure their existing secured debt in order to reduce their debt service to levels that are consistent with the currently depressed levels of the charter market.  If this effort is unsuccessful, the Debtors will pursue an orderly and organized liquidation of the Vessels in order to maximize the recovery to creditors.

43.     Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. The Debtors have requested joint administration of these chapter 11 cases by motion filed concurrently herewith. No trustees or examiners have been appointed in these cases.

44.     The Debtors collectively employ approximately 166 people.  As of the Petition Date, the Debtors had outstanding trade debt of approximately $9 million.  This debt was primarily incurred in connection with the provisioning, servicing and operation of the vessels.

45.     The Debtors generate income from various ocean transportation charters; however, as a result of the market conditions referred to above, charter hire is at a lower level than it was four years ago.  The present charter rates do not generate enough revenue to for the Debtors to service their debt under the CMB Facility, along with the Debtors unsecured obligations, salaries of crew members, and upkeep of the Vessels, including payment of bunker, spare parts, material and repair costs.

46.     Realizing the need to restructure its bank debt obligations, on November 15, 2014, the Debtors hired me, through the Claro Group's Houston office.  The Debtors hired me because of my personal, extensive history and the firm's history serving as financial advisers, chief restructuring officers, and trustees.  The Debtors also chose me because they wanted to retain a local, Houston-based, English speaking chief restructuring officer.  The Debtors' initial goal in retaining me was to increase efficiency for their existing businesses and negotiate a restructuring resolution for their  existing debt. Unfortunately, Debtors' lenders and Debtors were unable to come to restructuring terms despite several attempts at a consensual deal.

## IV.     FIRST DAY MOTIONS

### 1.   Emergency Motion for Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b)

47.     The Debtors anticipate that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of all Debtors.  To accomplish this as efficiently as possible, the Debtors seek joint administration of the Bankruptcy Cases under the Winland case. The Debtors respectfully

submit that joint administration of the Bankruptcy Cases is in the best interest of their estates,

creditors, and other parties-in-interest; and will further the interests of judicial economy and

administrative expediency by, among other things, obviating the need to: (i) file duplicate

motions, (ii) enter duplicate orders, and (iii) forward unnecessary, duplicate notices and other

documents to creditors and other parties-in-interest, which actions would cause the Debtors'

estates to incur unnecessary costs and expenses.

**2.  Emergency Motion for the Entry of an Order Pursuant to §§ 105(a), 362 and 365 of the Bankruptcy Code Enforcing and Restating Automatic Stay and Ipso Facto Provisions**

48.    The Debtors' business operations are conducted worldwide with significant assets

moving through international waters at any given time.  As a result, the Debtors have many

foreign creditors and counterparties to contracts who may not be well versed in the restrictions of

the Bankruptcy Code.  Many of these creditors do not transact business on a regular basis with

companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in

possession's authority to conduct its business. These creditors may be unfamiliar with the

operation of the automatic stay and other provisions of the Bankruptcy Code.

49.    Thus, various interested parties may attempt to seize assets located outside of the

United States to the detriment of the Debtors, their estates and creditors, or take other actions in

contravention of the automatic stay of § 362 of the Bankruptcy Code.  In addition, upon learning

of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to

terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of § 365 of

the Bankruptcy Code.

50.    Notwithstanding the fundamental nature of the automatic stay and *ipso facto*

protections, and the fact that they arise as a matter of law upon the commencement of a chapter

11 case, not all parties affected or potentially affected by the commencement of a chapter 11 case

are aware of the aforementioned Bankruptcy Code provisions.  Nor are all parties cognizant of the significance and impact of these provisions.  Experience has shown that it is often necessary to advise third parties of the existence and effect of the automatic stay and the invalidation of *ipso facto* provisions, particularly in cases in which the debtor conducts significant business in foreign jurisdictions.  Occasionally, it is necessary to commence proceedings in the bankruptcy court to enforce these provisions.  Accordingly, it is not uncommon for a bankruptcy court to issue an order embodying and restating the provisions of §§ 362 and 365 of the Bankruptcy Code.

51.     In this motion, the Debtors seek entry of an order, pursuant to §§ 105(a), 362 and 365 of the Bankruptcy Code, enforcing and restating the automatic stay and *ipso facto* provisions of the Bankruptcy Code.  The Debtors' intent is that a specific and explicit order from this Court will protect the Debtors from improper actions and from unwitting parties in foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

**3.  <u>Other First Day Motions</u>**

52.     The Debtors intend to file additional First Day Motions in the next few days.  To the extent additional facts are needed to support those additional motions, I will provide the Court with a supplemental affidavit and/or live testimony as appropriate.

53.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 12th day of February, 2015.


                                        */s/ Robert E. Ogle*
                                        Robert E. Ogle



Exhibit A

MV Fon Tai



MV Rui Lee



MV Winland Dalian

Exhibit B

Key:
Debtors are highlighted



Exhibit C

**Winland Ocean Shipping Corporation**
**Map of Operations**



Source: Office locations, port calls, and vessel information provided by Winland operations staff.

Notes:

Shows the ports MV Fontai and MV Rui lee has called within the past year (2014).