IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 15-60007** |
| **WINLAND OCEAN SHIPPING** | § | **(Jointly Administered)** |
| **CORPORATION, et al.,** | § | |
| | § | **Chapter 11** |
| Debtors. | § | |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL OF EXISTING SECURED LENDERS PURSUANT TO SECTION 363(C) OF THE BANKRUPTCY CODE; (II) GRANTING ADEQUATE PROTECTION FOR THE USE THEREOF; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001 AS TO USE OF CASH COLLATERAL**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.   UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**THERE WILL BE A HEARING ON THIS MOTION ON THURSDAY, FEBRUARY 19, 2015 AT 3:30 P.M. (CDT) BEFORE THE HONORABLE JUDGE DAVID R. JONES IN THE UNITED STATES DISTRICT COURTHOUSE, 515 RUSK, COURTROOM 400, HOUSTON, TEXAS 77002. TO APPEAR TELEPHONICALLY, PARTIES SHOULD CONSULT THE COURT'S PROCEDURES LOCATED ON THE COURT'S WEBSITE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Winland Ocean Shipping Corporation ("Winland"), SkyAce Group Limited (BVI) ("SkyAce"), Plentimillion Group Limited (BVI) ("Plentimillion"), Fon Tai Shipping Co. Ltd.

(HK) ("Fon Tai"), Winland Dalian Shipping S.A. (Panama) ("Winland Dalian"), and Won Lee Shipping Co. Ltd. (HK) ("Won Lee," and together with Winland, SkyAce, Plentimillion, Fon Tai and Winland Dalian, collectively, the "Debtors"), the above-captioned debtors and debtors in possession, by and through their undersigned proposed attorneys, hereby file this emergency motion (the "Motion"), for interim and final orders (i) authorizing use of cash collateral of existing secured lenders pursuant to Section 363(c) of the Bankruptcy Code, (ii) granting adequate protection for the use thereof, and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001 as to use of cash collateral.  In support thereof, the Debtors state as follows:

## I. JURISDICTION AND VENUE

1.      This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested in this Motion are Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014.

## II. BACKGROUND

2.      On February 12, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Court").

3.      Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession.  The Debtors have

- 2 -

requested joint administration of these chapter 11 cases by motion filed concurrently herewith.

No trustees or examiners have been appointed in these cases.

## A.      The Debtors' Business

4.      The Debtors are engaged in the business of international ocean transportation of bulk cargo.  At the height of their operations in 2011 and 2012, the Debtors had an ocean shipping fleet of 11 vessels, with a self-owned carrying capacity of over 240,000 tons; through monthly voyage charters and time charters, the Debtors provided service to major ports around the world.

5.      The business was founded as a chartering business in 1993 by Li Honglin ("Li") and his wife, Xue Yinghe ("Xue").  At the time, the market in China was dominated by State-owned enterprises and the level of service was generally not satisfying to customers.  As a privately owned business, Li and Xue made effective use of their advantages in service and price to build relationships with a large number of corporate customers.  Through a gradual accumulation of capital and experience, as well as a grasp of market trends, the company leased its first vessel in 1995.  In 1997, following the outbreak of the Southeast Asian financial crisis, the global shipping market experienced a downturn.  With an optimistic view of market prospects and stable customer base, the Debtors seized the opportunity to lease more vessels at a lower price, becoming a ship owner by the direct purchase of vessels in 1998.  Between 2000 and 2005, the Debtors purchased a total of 13 vessels. The Company purchased one in 2009, and constructed two new vessels in 2010 (one delivered in January 2011 and the other delivered in May 2011).

6.      The Debtors and other subsidiaries generated revenue of $85.6 million and net income of $19.1 million in 2008. With the global economic crisis and shipping market downturn

since late 2008, operating revenues in 2009 dropped to $50.2 million producing a net loss of $7.0 million. Operating revenues and net income improved in 2010 to $74.3 million and $3.1 million, respectively. For the fiscal year ended December 31, 2011, operating revenues and net income were $60.8 million and $3.1 million, respectively.

7.      Operating revenues and net income took a turn downward for the fiscal years 2012 through 2014.  The fiscal year ending December 31, 2012, had operating revenue of $56.4 million and a net loss of $7.3 million  The fiscal year ending December 31, 2013 had operating revenue of $35.1 million and a net loss of $2.9 million.  The fiscal year ending December 31, 2014 had operating revenue of $12.6 million and a net loss of $8.0 million.

8.      In 2011, the Debtors and other subsidiaries began selling off vessels in their fleet. In 2013 and 2014, nine vessels were sold ranging in price from approximately $870,000 to $1.8 million.  The proceeds from these sales were used to settle outstanding secured debt on the vessels as well as trade debt for spare parts, stores, agency fees, and bunker charges.

9.      The shipping industry is highly cyclical, with attendant volatility in charter hire rates and profitability. Following record charter rate levels in 2007 and 2008, charter rates in many sectors of shipping quickly plummeted to decade-low levels as a result of the global recession. As noted above, during the years leading up to the global recession, the Debtors were in the process of initiating an expansion of fleet, which included placing orders with a shipyard for two new vessels.  However, under the pressure of extremely low charter rates for its existing vessels, the Debtors have faced difficulty in servicing their debt and operating expenses.  The recent arrest of two of their vessels and the resulting loss of charter income has exacerbated the situation.

10.     On or about September 9, 2014, the "M.V. Rui Lee" was arrested by Milestone Shipping, S.A. ("Milestone") in Singapore pursuant to a Warrant of Arrest issued in the action *Milestone Shipping, S.A. v. Owner of the Vessel Rui* Lee, Case No. ADM 103/2014 (the "Milestone Action"), in the High Court of the Republic of Singapore.  The Milestone Action includes allegations of breach of contract, breach of duty, negligence and tort claims stemming from the charter of the M.V. Rui Lee from the Persian Gulf to China on or about March 5, 2014 and the carriage of certain iron ore cargo that allegedly resulted in loss, damage, non-delivery and/or delays.

11.     In order to protect its interest, China Merchants Bank Co. Ltd. ("CMB"), intervened in the Milestone Action on September 11, 2014, filing an action in the High Court of the Republic of Singapore. The action was against the Debtor Won Lee, as the owner of the vessel, Case No. ADM 162/2014 (the "CMB Action") for failure to make payments when due on the outstanding loan secured by the M.V. Rui Lee,.  CMB is requesting, among other things, payment of all amounts due under the loan.

12.     In connection with the CMB Action, a hearing regarding a summary judgment motion was scheduled before an assistant registrar on February 12, 2015.  This hearing commenced but was not completed and has been rescheduled for February 27, 2015  A separate hearing regarding an application to sell the M.V. Rui Lee is scheduled before the High Court of the Republic of Singapore on February 17, 2015.  If CMB is successful at the sales application hearing, the vessel will be appraised and posted for sale. As a result of the arrest of the M.V. Rui Lee, for the last several months this vessel has not been able to generate income critical to the Debtors.

13.     On or about December 15, 2014, the "M.V. Winland Dalian" was in the port of Ningde in Fujian Province at Fujian Xinyuan Shipbuilding Co., Ltd. to complete necessary repairs when it was arrested.  The "M.V. Winland Dalian" was arrested pursuant to a Civil Ruling and Arrest Order issued by the Xiamen Maritime Court.  The Applicant of this Arrest Order was Grand Capital International Limited ("GCIL"), which is a BVI-registered company in Taiwan.  GCIL requested the Arrest Order because Winland Dalian could not repay the debt related to its purchase of the "M.V. Winland Dalian."

14.     As a result of the arrest of the M.V. Winland Dalian, it has not been able to generate income critical to the Debtors.  If the repairs on the M.V. Winland Dalian were completed, and the M.V. Wiland Dalian were released, it could immediately begin to generate necessary income.

15.     The arrest of two of the Debtors' three vessels has made the Debtors' financial condition even more precarious and has significantly impaired the Debtors' ability to operate.  If the M.V. Rui Lee could be released and the M.V. Winland Dalian could have its repairs completed and be released, then these two vessels could immediately begin to earn money for the Debtors, which would improve their financial condition to the benefit of all creditors.

B.     **The Corporate Structure and Ownership of the Debtors**

16.     Winland is a Texas corporation, and was a publicly traded company filing financial reports with the SEC until August 14, 2012, when Winland terminated the registration of its common stock pursuant to SEC Rule 12g-4 (17 C.F.R. § 240.12g-4) by filing SEC Form 15. Winland, therefore, no longer files reports with the Securities and Exchange Commission. Winland, however, maintains a bank account with a Wells Fargo branch office in Victoria, Texas. Winland intends to convert this account to a debtor-in-possession bank account after

filing its bankruptcy petition.  In addition, Winland has provided retainers to the Claro Group's

Houston office and to the law firm of Okin & Adams, which also is located in Houston.

17.     Through its direct and indirect subsidiaries Winland currently owns three vessels: (i)

"M.V. Fon Tai" owned by the Debtor Fon Tai; (ii) "M.V. Rui Lee" owned by the Debtor Won

Lee; and (iii) "M.V. Winland Dalian" owned by the Debtor Winland Dalian.[1]  The Debtors,

through their affiliates, collect funds from customers and pay all expenses related to the Vessels.

An unaffiliated company, Dalian Master Well Ship Management Co., Ltd., manages all of the

Vessels.  On August 12, 2008, by a share exchange transaction, Winland (which was then known

as Trip Tech, Inc.) acquired all of the issued and outstanding securities of SkyAce from Pioneer

Creation Holdings Limited ("Pioneer").[2]  More than 82.5% of Winland's common stock is held

by Pioneer and controlled by Li and Xue; the balance is held by fewer than 12 record holders. [3]

18.     SkyAce is a holding company that was organized in the British Virgin Islands on

September 22, 2006.  SkyAce was formed solely for the purpose of acquiring Plentimillion and

Best Summit Enterprise Limited ("Best Summit") from Li and Xue, each of whom had owned

fifty percent (50%) of the stock of both Plentimillion and Best Summit.  In 2011, SkyAce sold

Best Summit but still owns all of the outstanding stock of Plentimillion.  SkyAce, which is a

---

[1] The M.V. Fon Tai, the M.V. Rui Lee and M.V. Winland Dalian are hereinafter collectively referred to as the "Vessels."

[2] In this share exchange, Winland acquired all of the issued and outstanding securities of SkyAce from Pioneer in exchange for 76,925,000 shares of Winland's common stock and 1,000,000 shares of Series A Preferred Stock which preferred shares were convertible into (and subsequently were converted into) 30,000,000 shares of common stock.  In March, 2011, Winland effected a 1.5 for 1 forward stock split of its common stock to shareholders of record as of March 25, 2011, increasing the total issued and outstanding number of shares of common stock to 195,000,000 shares.  As a result, the common shares held by Pioneer were converted into an aggregate 160,387,500 shares of Winland common stock.

[3] The common stock of Winland had been quoted on the Over the Counter Bulletin Board's OTCQB market under the symbol "WLOL".

wholly-owned subsidiary of Winland, has no significant business operations other than the ownership of Plentimillion.

19.    Plentimillion is a holding company that was organized in the British Virgin Islands on July 5, 2006. Its wholly-owned subsidiaries, Fon Tai, Won Lee, and Winland Dalian, each owns one of the Vessels and derives income from shipping charters. The Vessels are operated by these Debtors, but those operations are managed by Dalian Master Well Ship Management Co. Ltd., a Chinese company whose principal activities include shipping agency services, booking cargo space, storage of goods and processing customs declarations.[4]

**C.     Description of Secured Debt**

**(1) Loan Facility from China Merchants Bank**

20.    The Debtors' acquisition of two of the Vessels— M.V. Fon Tai and M.V. Rui Lee ― was partially financed with funds loaned by CMB. By a certain facility agreement dated March 26, 2010 (together with all amendments and supplements to it, the "CMB Facility"), made by and among CMB, as lender, Fon Tai and Won Lee, as joint and several borrowers, SkyAce, as corporate guarantor, and Li and Xue as individual guarantors, CMB made available to Fon Tai and Won Lee a secured loan facility of $37 million for the finance and construction of M.V. Fon Tai and M.V. Rui Lee. As of June 30, 2011, the Debtors drew down $37 million from the CMB Facility for the purpose of commencing the building of these two vessels. Currently, there is approximately $25.9 million outstanding in principal plus accrued interest on the CMB Facility.

---

[4] The Debtors' corporate structure is identified in the attached Exhibit B, which also identifies other non-debtor entities.

21.    Pursuant to separate Deeds of Charge dated March 26, 2010, Plentimillion granted CMB a charge on the entire issued share capital of Fon Tai and Won.

22.    As additional security for the CMB Facility, Fon Tai and Won Lee executed separate Deeds of Covenants and Hong Kong Ship Mortgages, dated January 10, 2011 and May 5, 2011, respectively, granting CMB first priority mortgages on the M.V. Rui Lee and M.V. Fon Tai (together, the "CMB Mortgages").

23.    As additional security for the CMB Facility Agreement, Won Lee and Fon Tai also executed and delivered to CMB certain separate General Assignments dated January 10, 2011 and May 5, 2011, respectively, assigning the charter proceeds, earnings, insurance proceeds, and requisition compensation payable in respect to the M.V. Rui Lee and M.V. Fon Tai.

24.    By virtue of these documents, CMB has (i) a mortgage lien on the M.V. Rui Lee and M.V. Fon Tai and (ii) a security interest in cash and receivables generated from the operation of the two vessels.

**(2) Installment Sale Agreement with Grand Capital International Limited**

25.    By a certain Installment Sale Agreement dated July 22, 2013 (as amended and modified, the "GCIL Agreement") made by and among GCIL, as the seller, and Winland Dalian, as the buyer, GCIL agreed to sell the M. V. Winland Dalian to Winland Dalian on a deferred payment basis at a purchase price of $4 million.  Li and a non-debtor affiliate, Dalian Winland Group Corporation, are jointly and severally liable for the Debtors' obligations under the GCIL Agreement, which has a current principal balance of $3.2 million plus accrued interest.

26.    To secure its obligations under the GCIL Agreement, Winland Dalian granted GCIL a first priority ship mortgage in the M.V. Winland Dalian by a Deed of Covenants, dated

July 29, 2011 (the "GCIL Mortgage," and together with the CMB Mortgages, the "Mortgages").

27.     As further security for the GCIL Agreement, Winland Dalian, as owner, and Winland Shipping Company Limited, as bareboat charter, executed and delivered to GCIL that certain General Assignment dated July 29, 2013, by which Winland Dalian collaterally assigned to GCIL the proceeds and earnings of the M.V. Winland Dalian.

28.     By virtue of these documents, GCIL has (i) a mortgage lien on M.V. Winland Dalian and (ii) a security interest in cash and receivables generated from the operation of the vessel.

### (3) Mortgage to China CITIC BANK Co. Ltd.

29.     By separate mortgages (the "Second Mortgages") dated November 29, 2012, Fon Tai and Won Lee granted mortgages on, respectively, the M.V. Fon Tai and M.V. Rui Lee to China CITIC BANK Co. Ltd. ("CITIC") to secure credits of up to $15 million issued by CITIC to these Debtors in the 36 month period beginning on November 29, 2012 and ending on November 28, 2015.   These credits include, but are not limited to, loans, bills, letter of undertaking and other financial accommodations.  The amount presently outstanding to CITIC is principal of approximately $19.6 million plus accrued interest.

## III. RELIEF REQUESTED

30.     Pursuant to Bankruptcy Rule 4001(b), the following summarizes the material terms of the Interim Order.  The Debtors seek authority to use the Cash Collateral (as defined below) of China Merchants Bank Co., Ltd.  The Debtors seek to use such Cash Collateral as working capital in the operation of their business for the purposes specified in, and at least for the period defined in, the attached budget.  As adequate protection for the diminution in value of

Cash Collateral, the Debtors will (i) provide an existing equity cushion, (ii) maintain the value of their business as a going-concern, (iii) provide replacement liens upon now owned and after-acquired cash to the extent of any diminution in value of Cash Collateral, and (iv) provide superpriority administrative claims to the extent of any diminution in value of Cash Collateral.

31.     As a consequence of the prepetition secured financing described above, certain cash in the Debtors' possession or in which the Debtors have an interest on and after the Petition Date constitutes asserted cash collateral ("Cash Collateral") in which the CMB may assert an interest within the meaning of § 363(a) of the Bankruptcy Code.  By this Motion, pursuant to Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014, the Debtors request that the Court enter an order (i) approving the Debtors' use of Cash Collateral, (ii) providing adequate protection for, and to the extent of, any diminution in the value of the Cash Collateral, and (iii) scheduling a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing and approving the relief requested in this Motion.

## IV. BASIS FOR RELIEF

32.     Under 11 U.S.C. § 363(c)(2), a debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the Court, after notice and a hearing, authorizes the use of the cash collateral.  Pursuant to 11 U.S.C. § 363(c)(3), the Court must condition a debtor's use of cash collateral as is necessary to provide adequate protection of the interest in the cash collateral claimed by a party.

33.     Bankruptcy Rule 4001(b) and (d) govern the procedure for consideration of motions to use cash collateral, and both of these subsections provide for expedited consideration

of such motions for cases in which immediate interim relief may be crucial to the success of a reorganization.

34.     At a hearing on a debtor's motion for the use of cash collateral, the debtor bears the burden of proof on the issue of adequate protection, and the party claiming an interest in the cash collateral bears the burden of proof on the issue of the validity, priority, or extent of the lien.

**A.     Failure to Obtain the Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm.**

35.     As of the Petition Date, the Debtors do not have unencumbered cash sufficient to fund their business operations and pay present operating expenses.  Therefore, the Debtors have an urgent need for the immediate use of Cash Collateral pending a final hearing on this Motion.

36.     The operation of the Debtors' vessels is extremely capital intensive, and any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business. For example, the Debtors incur ongoing operating expenses related to navigating vessels on the high seas, which costs include crew costs, provisions, deck and engine stores, lubricating oils, insurance, maintenance and repairs, bunkers, port expenses, etc.  Absent the use of Cash Collateral, these expenses cannot be met and the sole income producing assets of the Debtors—the Vessels—will be unable to operate and could possibly be subject to maritime liens and the threat of seizure at international ports.

37.     Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this motion.  The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue.  Without authority to use Cash Collateral, the Debtors will not be able to function as a

going concern and will not be able to proceed to consideration of a plan of reorganization. Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, and will be in the best interests of the Debtors, their estates and their creditors.

**B.     The Proposed Adequate Protetion for CMB is Sufficient.**

38.     Through this Motion, the Debtors intend to provide adequate protection, to the extent of the aggregate diminution in value of Cash Collateral from and after the Petition Date, to CMB for the use of the Cash Collateral by:

   a.   providing an existing equity cushion in the Vessels;

   b.   maintaining the going concern value of CMB's collateral by using the Cash Collateral to continue to operate the business and administer these cases;

   c.   providing to CMB a postpetition replacement lien pursuant to 11 U.S.C. § 361(2) in the accounts receivable of the relevant Debtor(s), including cash generated or received by such Debtor(s) subsequent to the Petition Date, but only to the extent that CMB had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date, and subject to the Carve-Out (as defined in the attached proposed order).  The priority of any postpetition replacement liens granted to CMB shall be the same as existed as of the Petition Date; and

   d.   providing to CMB a superpriority claim pursuant to 11 U.S.C. § 507(b) over all administrative expense claims and unsecured claims, of any kind or nature whatsoever, whether in existence on or arising after the Petition Date, against the relevant Debtor or its specific estate, subject only to the Carve-Out.

39.     The Debtors believe that CMB is adequately protected for the use of the Cash Collateral in that the orderly liquidation value of CMB's collateral exceeds the amount due to CMB.  "A sufficient equity cushion is itself a recognized form of adequate protection." *Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995).  Further, "[a] classic method for finding adequate protection is the existence of an equity cushion.  In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 677 (D. Ariz. 1994) (citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)).

40.     The continuation of the Debtors' operations presents the best opportunity for the CMB to receive the greatest recovery on account of its claim.  Accordingly, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and thereby protect the CMB's interests.  Courts have consistently recognized that the preservation of the going concern value of secured lenders' collateral constitutes adequate protection of such creditors' interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably postpetition, then the secured creditor is adequately protected); *In re 499 W. Warren St. Assocs., Ltd. P'ship,* 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditors' secured position would be enhanced by the continued operation of the debtors' business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a

creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

41.     Additionally, through this Motion, the Debtors intend to provide further adequate protection, to the extent of any diminution in value, to CMB for the use of the Cash Collateral by providing to CMB postpetition replacement liens pursuant to 11 U.S.C. § 361(2) in accounts receivable, including cash generated or received by the Debtors subsequent to the Petition Date, but only to the extent that CMB had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date.  The priority of any postpetition replacement liens granted to CMB shall be the same as existed as of the Petition Date.

## V. REQUEST FOR INTERIM AND FINAL RELIEF

42.     An immediate need exists for the Debtors to obtain approval of the use of Cash Collateral in order to meet key expenses as described above and as identified in the interim budget ("Interim Budget") attached hereto as Exhibit A.[5]  Without the immediate use of the Cash Collateral for an interim period, the Debtors will essentially be forced to call their vessels to port, close their business, and risk arrest and fire sales of their Vessels.  Obviously this would have a severe negative impact upon the Debtors' going concern value and ability to successfully create value for all creditors.  The Debtors' business, as a going concern, has a value far in excess of any value that might be obtained in a chapter 7 liquidation.  A complete shutdown of the Debtors' business, even for a short period, would result in the loss of employees, and creditors

---

[5] Exhibit A shows the Debtors' estimated revenue and expenses for a 13 week period.  As an interim matters, the Debtors only seek use of Cash Collateral as shown on Exhibit A during the weeks up to the week in which the Court schedules the Final Hearing. The Debtors reserve the right to amend the budget prior to the Final Hearing.

and equity receiving substantially less from the enterprise than going concern value. Accordingly, it is imperative that a preliminary hearing be set immediately.

43.     Pursuant to Bankruptcy Rule 4001, the Debtors request that the Court set a preliminary hearing on the use of Cash Collateral, and that at such preliminary hearing, the Court authorize the temporary use of Cash Collateral consistent with the Interim Budget, in order to avoid immediate and irreparable harm to these bankruptcy estates pending a final hearing.

## VI. REQUEST FOR FINAL HEARING

44.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors' also request that the Court set a date for a final hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VII. NOTICE

45.     Notice of this Motion has been or will be provided by e-mail or First Class Mail on (a) the Office of the United States Trustee for the Southern District of Texas, (b) all known or alleged secured creditors, (c) the 30 largest unsecured creditors of the Debtors, (d) all known shareholders holding over 5% of a class of equity interests in any of the Debtors, and (e) any persons who have filed a request for notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no further notice of this Motion is required.

## VIII. BASIS FOR EMERGENCY RELIEF

46.     An emergency exists because the Debtors face immediate and irreparable harm to the estate absent the emergency consideration of the relief requested in this motion.  The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses

that may be at issue.  As a result, if an emergency hearing is not set, the Debtors will be unable to operate.

WHEREFORE, the Debtors request that this Court enter an order, in substantially the form filed herewith, granting the relief requested in this Motion, and such other and further relief as may be just and proper under the circumstances.

DATED:  February 17, 2015.

**OKIN & ADAMS LLP**

By: ___ /s/ *Matthew S. Okin* _____
     Matthew S. Okin
     Texas Bar No. 00784695
     Email: mokin@okinadams.com
     George Y. Niño
     Texas Bar No. 00786456
     Email: gnino@okinadams.com
     Ruth E. Piller
     Texas  Bar No. 00794461
     Email: rpiller@okinadams.com
     1113 Vine St. Suite 201
     Houston, TX  77002
     Tel: (713) 228-4100
     Fax: (888) 865-2118

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(I)**

I hereby certify to the accuracy of the matters set forth in the foregoing motion.

     */s/ Matthew S. Okin* ___
     Matthew S. Okin