IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **WINLAND OCEAN SHIPPING CORPORATION,** *et al.*,[1] | § § § | **Case No. 15-60007 (DRJ)** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

**REPLY OF CHINA MERCHANTS BANK CO. LTD. TO DEBTORS' RESPONSE AND OBJECTION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
[This Reply Relates to the Response at Docket No. 101]

---

[1] The Debtors in these chapter 11 cases are: (1) Winland Ocean Shipping Corporation ("Winland"); (2) SkyAce Group Limited (BVI) ("SkyAce"); (3) Plentimillion Group Limited (BVI) ("Plentimillion"); (4) Fon Tai Shipping Co. Ltd. (HK) ("Fon Tai"); (5) Winland Dalian Shipping S.A. (Panama) ("Winland Dalian"); and (6) Won Lee Shipping Co., Ltd. ("Won Lee").

HOU:3552791.3

# **TABLE OF CONTENTS**

                                  **Page**

PRELIMINARY STATEMENT ............................................................................................... 1
BACKGROUND ............................................................................................................................ 3
REPLY ............................................................................................................................................ 4
I.    CMB Is Not Adequately Protected. ................................................................................. 4
      A.    There Is No Equity Cushion ................................................................................. 5
      B.    The Debtors' Proposed Payments Are Speculative ............................................... 5
II.   There Is No Equity In The CMB Vessels And The CMB Vessels Are Not Necessary For An Effective Reorganization ..................................................................... 8
      A.    There Is No Equity In The CMB Vessels ............................................................. 8
      B.    The CMB Vessels Are Not Necessary For An Effective Reorganization ............. 8
CONCLUSION ............................................................................................................................. 13

China Merchants Bank Co., Ltd. ("CMB"), through its undersigned counsel, files this Reply (the "Reply") to Debtors' Response and Objection to Motion of CMB for Relief from the Automatic Stay [Docket No. 101] (the "Lift Stay Response"). In support of the Reply, CMB respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.    The Debtors fail to show that the collateral value of the CMB Vessels is adequately protected. CMB's valuation report shows no equity cushion and that the value of the CMB Vessels has declined prior to <u>and</u> during the bankruptcy case. The Debtors submit a suspect valuation report in response that, even if accepted, shows an insufficient equity cushion and contains no opinion on the future direction of the value of the CMB Vessels. The Debtors also argue CMB will be adequately protected by proposed, yet-to-be made adequate protection payments. The Debtors' current cash flow is insufficient for the Debtors to actually pay the proposed adequate protection payments. Accordingly, the proposed adequate protection payments are based on a number of speculations, including that:

- this Court will order the release of the M.V. Rui Lee from arrest by the Singapore court at no cost to the Debtors and force CMB to pay anywhere from $700,000-$2,800,000 in pre- and postpetition release expenses;

- the Debtors will restore the M.V. Rui Lee to operational condition with no amount built into the budget to pay the admittedly "necessary maintenance and repair";

- the Debtors will have access to $1.5 million in equity contributions for 2015 without identifying the source of the funds and will receive $1 million in sale

---

[2] Capitalized terms used herein and not otherwise defined have the meaning set forth in CMB's Motion for Relief from the Automatic Stay [Docket No. 51] (the "Lift Stay Motion"). CMB has also filed (i) a *Motion Pursuant To 11 U.S.C. §362(d) For Entry of Order Granting Relief From Automatic Stay* [Case No. 15-60007, Docket. No. 51] (the "Lift Stay Motion" and, together with the Motion to Dismiss, the "Dispositive Motions") and (ii) simultaneously herewith a *Memorandum of Law In Opposition to Plaintiff's Request for Preliminary Injunction*, Case No. 15-06005 (the "**CMB Injunction Response**"). The CMB Injunction Response addresses Count 1 of the Complaint. Although technically not necessary for the Court to resolve the Motion to Dismiss, for context we refer herein to certain facts set forth in the CMB Injunction Response.

1

- proceeds from the sale of the M.V. Winland Dalian, a vessel which is currently under arrest in China for not paying its debts to other creditors; and

- the M.V. Fon Tai and the M.V. Rui Lee (once it is released from arrest) will immediately begin generating revenue from charter agreements and will be able to generate $3.1 million in gross profit in 2015 to fund operating expenses, restructuring expenses and adequate protection payments to CMB, even though the M.V. Fon Tai is operating essentially at breakeven without factoring in the costs of this case or any adequate protection payments. *See* Ogle Report, p. 16.

It is highly unlikely that any of these assumptions will come true. "An offer of adequate protection based on the speculative possibility that the funds will materialize simply does not constitute adequate protection."[3] CMB's interest in the CMB Vessels is not adequately protected and the stay must be lifted.

2. The Debtors fail to present competent evidence regarding its reorganization prospects. The Debtors submit a report from its U.S.-based Chief Restructuring Officer (the "Ogle Report") that purports to show that the Debtors might be able to reorganize. Again, the Debtors are forced to rely on numerous speculations to come to this conclusion that are not supported, and for which Mr. Ogle expresses no opinion. While projections and assumptions are normally built into any plan of reorganization, they must be reasonable and supported in fact; not just unsubstantiated hopes for a successful reorganization. Here, in addition to the assumptions listed above, the Debtors' plan is predicated upon the following additional speculative assumptions:

- An unknown source will provide an additional $1.9 million equity infusion to fund the exit from bankruptcy;

- Operating expenses will essentially stay the same over the next four years while at the same time daily charter rates skyrocket from approximately $6500 in 2015, to $7,500 in 2016, to $10,500 in 2017, to $12,300 in 2018 and to $13,300 in 2019;

---

[3] *In re Lakota Canyon Ranch Development, LLC,* No. 11-26157, 2012 WL 243741, at*3 (Bankr. D. Colo. Jan. 25, 2012). And see discussion *infra*.

- Debtors will obtain a cramdown of CMB's loan with a 5 year term with a 20 year amortization while failing to take into consideration the limited useful life and declining value of the CMB Vessels or the ability to pay/refinance the balloon at maturity;

- The contemplated 3.75% interest rate for the cramdowned CMB loan will be found proper, even though Debtors offer no support;  and

- Starting in November 2015, payment to unsecured creditors amounting to a 5% recovery for the remaining $42 million in unsecured claims over three years  with old equity ("Mr. Li") retaining its ownership interest in exchange for his equity contribution, with no provision for a market check.  *See* Ogle Report, p. 17.

The test here is not whether the Debtors can propose the general terms of any plan of reorganization – it is whether there is a reasonable prospect for a successful reorganization within a reasonable time.  This proposed "plan" is not confirmable and is based entirely on unsubstantiated and overly optimistic speculation with no evidentiary support.  "A reorganization plan under chapter 11 must be more than a nebulous speculative venture and must have a realistic chance of success which would lead to rehabilitation, and if outside financing is needed, it must be <u>clearly</u> in sight."[4]  CMB should not bear the burden of Mr. Li's unsubstantiated hopes and aspirations in a depressed shipping market where vessel values are declining and charter rates are at historic lows with no sign of rebound.  The automatic stay must be lifted to allow CMB to exercise its rights and remedies against the CMB Vessels.

## BACKGROUND

3.    On March 25, 2015, CMB filed its Lift Stay Motion requesting that the Court modify the automatic stay to allow CMB to exercise its rights with respect to its collateral under relevant loan and security documents and applicable law, including the CMB Vessels.

---

[4] *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 792 (Bankr. W.D. Tenn. 1992) (emphasis in original) (citation omitted); *see also In re Quail Farm, LLC*, 2010 WL 1849867, at *5-7 (Bankr. N.D. W. Va. May 5, 2010) (holding that hope of cramming down secured creditor without specific details of how that would be accomplished was insufficient to show a likelihood of rehabilitation).

3

4. Later, on March 25, 2015, the Debtors filed an adversary complaint against CMB (the "Complaint") seeking, among other relief, preliminary and permanent injunctions, turnover of the M.V. Rui Lee and a declaration that CMB has violated the automatic stay. CMB disputes these allegations in full and has filed a motion to dismiss the Complaint. The Debtors filed a response to the motion to dismiss on April 28, 2015. Concurrently herewith, and pursuant to the Agreed Scheduling Order [Docket No. 82], CMB is filing a reply to the Debtors response to the Motion to Dismiss (the "MTD Reply").

**REPLY**

**I.  CMB Is Not Adequately Protected.**

5. If the value of a secured creditor's collateral is not adequately protected during the bankruptcy case the stay must be lifted for "cause." 11 U.S.C. § 362(d)(1). The Debtors bear the burden of proof with respect to demonstrating that CMB is adequately protected. *See* 11 U.S.C. § 362(g)(2). Case law is clear that "[a]n offer of adequate protection based on the speculative possibility that the funds will materialize simply does not constitute adequate protection." *In re Lakota Canyon Ranch Development, LLC,* No. 11-26157, 2012 WL 243741, at *3 (Bankr. D. Colo. Jan. 25, 2012) (citing *In re DB Capital Holdings, LLC*, 454 B.R. 804, 817-18 (Bankr. D. Colo. 2011) (citing *Rader v. Boyd*, 252 F.2d 585 (10th Cir.1958)); *Rocco v. J.P. Morgan Chase Bank*, 255 Fed. Appx. 638, 641 (3rd Cir. 2007) (finding speculative offer of adequate protection relating to litigation outcome is not sufficient). Rather than show how the Debtors are <u>currently</u> providing adequate protection (which they are not and cannot provide), the Debtors simply assert that they <u>could</u> provide adequate protection if the M.V. Rui Lee is released and they are given an opportunity to operate two ships.

### A. There Is No Equity Cushion

6. There is no equity cushion in the value of the CMB Vessels to protect CMB's interest. As set forth in the Lift Stay Motion, CMB's claim was not less than $28 million as of the Petition Date. When factoring in the continued accrual of CMB's interest and fees, the claim amount will only grow.

7. As set forth in the expert report of Dr. Adam Kent, a copy of which is attached hereto as <u>Exhibit A</u> (the "Kent Report") the value of the CMB Vessels – approximately $25.8 million – is less that the CMB claim amount. The Kent Report shows that ship values have been steadily declining throughout the year, <u>including since the commencement of these cases</u> (*See* Kent Report, § 8.0.4, Chart 8.2)  There is no equity cushion and the value of the CMB Vessels is declining.

8. Moreover, even taking the Debtors' purported value of the CMB Vessels of approximately $31.8 million at face value[5], an equity cushion of approximately $3.8 million, or 13.5% exists. Case law in this jurisdiction is clear that an equity cushion of 13.5% is insufficient to provide adequate protection. *In re Las Torres Dev. LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) (collecting cases and using 20% as a benchmark in a case involving real estate). This is especially true where collateral value is declining and here, where the assets have a limited useful life.

### B. The Debtors' Proposed Payments Are Speculative

9. The Debtors' purported adequate protection cash payments are premised on the assumptions that they will be successful in obtaining the cost-free release of the M.V. Rui Lee

---

[5] CMB disputes this valuation. The Debtors value is based on the Report of TaoTao Yu (the "Yu Report") of Total Shipping Company Limited which is attached to the Response. CMB believes that the Report of Mr. Yu is faulty and does not comply with the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedures and reserves all rights regarding same.

5

from the Singapore court and increased revenue from operating two vessels. The first assumption is the cost-free release of the M.V. Rui Lee. The Debtors gloss over how the $700,000 - $2,800,000 in unpaid pre- and postpetition costs of release will be funded, only stating in the Ogle Report that the Debtors do not anticipate the need to pay any of the costs associated with arrest.[6] The Debtors apparently forget that the costs cannot be surcharged to CMB or against CMB's collateral, including cash collateral. Pursuant to the Second Interim Order Authorizing Use of Cash Collateral [Docket No. 59] (the "Second Cash Collateral Order"), the Debtors waived the right to require CMB to pay any arrest costs associated with the M.V. Rui Lee.[7] Accordingly, the Debtors have voluntarily waived their rights to force CMB to pay the arrest costs.

10.  The Debtors acknowledge that the key to their increased revenue assumption is driven by daily charter rate projections. Ogle Report, "Projected Cash Receipts and Disbursement For 2015 - 2019", n.3 ("Monthly cash receipts are calculated based on 30 days multiplied by the daily charter rate"). The Debtors, however, do not provide any evidence that charter rates will actually increase – not in the Yu Report, the Ogle Report or any other source. The Kent Report negates the Debtors' unsubstantiated assumption and establishes that charter rates are at historic lows with no likelihood of rebound for the next several years (*See* Kent Report, §4.0.5 and §11.0 et seq.). Indeed, Dr. Kent's opinion is supported by a strong basis,

---

[6] The Debtors assert several times in the Response that CMB is violating the automatic stay through the arrest proceeding. The Debtors' assertion has no merit, and CMB is filing the Dismissal Reply concurrently herewith addressing the baseless accusation of a stay violation and hereby adopts and incorporates the Dismissal Reply as if fully set forth herein.

[7] Specifically, paragraph 18 provides that "[a]s further condition of CMB's consent to the Debtors use of the Prepetition Collateral, including, without limitation, the Cash Collateral and CMB Vessels, no costs or expenses of administration of the Cases or any successor cases (including, without limitation, any costs or expenses of preserving or disposing of the Prepetition Collateral) shall be charged against or recovered from or against CMB, the Adequate Protection Collateral, the Prepetition Collateral, or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of CMB, and no such consent shall be implied from any other action, inaction, or acquiescence of CMB."

6

including by looking at the futures market for charter rates. Debtors rely on Mr. Li as the source of the charter rate assumptions built into the Debtors' proposed plan and the Ogle Report. Mr. Li's overly optimistic charter rate projections from earlier in this case have already proved materially incorrect.

11. The Debtors (Mr. Li) were wrong on charter rate projections from just a few months ago and have failed to meet the revenue projections set forth in the cash collateral budget. The cash collateral budget projected charter rates of $7,200 in May 2015, $8,000 in June 2015, and $9,000 in July 2015 for the M.V. Fon Tai.[8] Yet, as acknowledged in the Ogle Report, the Debtors have signed a three-month charter that will provide a daily rate of $6,300 for May through July 2015, a shortfall of approximately $160,000 in projected revenue. Through the week ended April 26, 2015, the Debtors' actual cash receipts are almost $60,000 lower than projected just several weeks ago. And at the same time, the Debtors are not paying budgeted expenses and have failed to provide any answer why these operational expenses are not being paid or explained that some expenses were not paid "due to insufficient funds." Given that Mr. Li was materially off on his short-term charter rate projections in the cash collateral budget, there is no basis to believe he will be more accurate with his long-term projection of massive charter-rate growth. Indeed, it appears that, in order to make up revenue shortfalls, the Debtors are continuing to "defer" payment of postpetition budgeted expenses. There is no reason to believe that the Debtors' charter rate and expense projections in the Debtors' plan will be any more accurate.

12. Quite simply, the Debtors cannot show that CMB is adequately protected. Debtors have a razor thin equity cushion or, at best, a razor thin one, and rely on highly

---

[8] See Second Cash Collateral Order [Docket No. 59] (Budget attached as Exhibit A).

speculative charter rate projections and uncertain litigation results that will allegedly allow for adequate protection payments, all of which combined falls woefully short of satisfying the requirements to provide adequate protection. Mere speculation of the ability to provide adequate protection fails to carry the Debtors' burden. Thus, the Lift Stay Motion should be granted under section 362(d)(1) because CMB's interest in the CMB Vessels is not being (and cannot be) adequately protected.[9]

## II. There Is No Equity In The CMB Vessels And The CMB Vessels Are Not Necessary For An Effective Reorganization

### A. There Is No Equity In The CMB Vessels

13. The CMB Vessels are worth less than all of the liens -- CMB's first lien and the junior lender's second lien – encumbering them. This is not contested by the Debtors.

### B. The CMB Vessels Are Not Necessary For An Effective Reorganization

14. As set forth in the Lift Stay Motion, to establish that the CMB Vessels are necessary for an effective reorganization, the Debtors must show a reasonable prospect for a successful reorganization within a reasonable time. *Canal Place Ltd. P'ship v. Aetna Life. Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 577 (5th Cir. 1991); *In re WGMJR Inc*, 435 B.R. at 432 ("The debtor must do more than manifest unsubstantiated hopes for a successful reorganization.") (citation omitted). Significantly, "[t]he mere indispensability of the property to the debtor's survival and the debtor's hopes of reorganization are insufficient to justify continuation of the stay when reorganization is not reasonably possible." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs.)*, 808

---

[9] *See In re WGMJR, Inc.*, 435 B.R. 423, 433 (Bankr. S.D. Tex. 2010) (finding that "cause" existed to lift the stay where the evidence indicated debtor's inability to provide adequate protection to secured creditor); *In re SBPM Holdings*, No. 10-80310-G3-11, 2010 WL 4976952, at *4 (Bankr. S.D. Tex. Dec. 2, 2010) (holding that stay should be lifted for cause, pursuant to section 362(d)(1), where debtor made no effort to adequately protect secured creditor's interest in the real property securing its claim or cash collateral).

F.2d 363, 370-71 (5th Cir. 1987) *aff'd sub nom. United Sav. Ass'n of Tex. v. Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

15.   The Ogle Report contains the following assumptions upon which the Debtors' reorganization "plan" is predicated: (i) the Debtors will successfully obtain the release and return of the M.V. Rui Lee at no cost to the Debtors and force CMB to pay from $700,000-$2,800,000 in pre- and postpetition release costs; (ii) the Debtors will be able to immediately restore the M.V. Rui Lee to operational condition at no cost; (iii) the Debtors will have access to an additional $1.5 million to fund operating and reorganization expenses through the remainder of 2015 calendar year; (iv) the Debtors will have access to additional operating capital (either through equity infusion or exit financing) of $1.9 million from January 1, 2016 to December 31, 2017; and (iv) there will be a dramatic increase in charter rates over the next 4 years. Significantly, and not surprisingly, the Mr. Ogle <u>expresses no opinion on the source or availability of the required equity contributions or DIP Financing and has no opinion on the charter rates</u>. This is consistent with Mr. Ogle's prior testimony in court, at the meeting of creditors and at his deposition. With these unsubstantiated assumptions in mind, the Ogle Report asserts that the Debtors could restructure the existing debt obligations through a consensual or cram-down plan, refinance the secured debt, and/or liquidate its assets for the benefit of creditors, all while maintaining Mr. Li's equity ownership in the Debtors. There is, however, no evidence that any of this will or could really occur.

16.   As set forth in the Dismissal Reply, the Debtors are not entitled to release of the M.V. Rui Lee, let alone absent payment of any of the arrest costs. And as set forth above, the Debtors have voluntarily waived their right to force CMB to pay the release costs. Even if the Debtors are able to obtain release of the M.V. Rui Lee, the reorganization efforts remain

9

premised on obtaining $3.4 million in financing, exploding charter rates, a contested cramdown of the CMB loan, and a new value plan without a market check. Mr. Ogle "expresses no opinion" in the Ogle Report on the ability to obtain the necessary financing. Accordingly, for the Debtors proposed plan to work, $3.4 million will need to be provided from a yet-to-be identified source notwithstanding that the Debtors own projections show the CMB Vessels are worth nearly $16 million less than the existing debt.

17. Similarly, the Debtors proposed plan is premised on exploding charter rates without any evidence to establish that such rates are legitimate. The Debtors' only source of income is through time charters and a sale of the M.V. Winland Dalian. In 2016, the Debtors project that operating both CMB Vessels will result in revenue of approximately $5.5 million. (*See* Ogle Report, "Projected Cash Receipts and Disbursement For 2015 - 2019") In 2017, the revenue from the exact same source increases by 40% to $7.7 million, and by 17% to $9 million in 2018, for a three year increase of approximately 63%. As discussed above, any increase in revenue is driven by daily charter rates and the Ogle Report assumes daily charter rate of $7,500 a day in 2016, increasing to $10,500 in 2017 and to $12,300 a day in 2018.[10] Yet, as stated in Dr. Kent's report, which, among other things, looked at the futures market for charter rates, charter rates will likely not rebound for several years (Kent Report §11.0 et seq.), and the Debtors have already established their lack of acumen in projecting charter rates, having failed to hit their short-term projected charter rates in the cash collateral budget. As recently explained by one court "the dry bulk shipping market parallels what classical economists would call "perfect competition," Coleman Decl. ¶ 21, where 'rates are determined on a daily basis by supply and

---

[10] The 2018 projected daily rate is twice the amount that the M.V. Fon Tai is current being paid under its time charter agreement.

demand in the market . . . [and [c]onsequently <u>a company's ability to predict long term revenues is severely constrained.</u>'" *Id.* ¶ 17. *See In re Genco Shipping & Trading Ltd., et al.*, 513 B.R. 233, 255 (Bankr. S.D.N.Y. 2014).[11]

18.   Other foreign shipping chapter 11 cases filed without secured creditor support and without sufficient operating cash or refinancing prospects have all liquidated, but only after massive expense and value destruction suffered by secured creditors. *See, e.g.*, *In re Baytown Navigation Inc.*, Case No. 11-35926 (Bankr. S.D. Tex.); *In re TMT Procurement Corp.,* Case No. 13-33763 (Bankr. S.D. Tex.); *In re Marco Polo Seatrade B.V.*, Case No. 11-13634 (Bankr. S.D.N.Y.). These failed cases were filed by those debtors hoping that the shipping market would rebound, and were, like here, essentially ploys by the owners to obtain a free injunction (the automatic stay) and option that equity would one day be in the money.

19.   Plans for reorganization cannot be speculative, and they must be achievable within a reasonable amount of time.[12] The Debtors' plan is premised on an unsubstantiated hope that all of the assumptions discussed above actually occur. Not only does the Rule of Probability

---

[11] In the *Genco* case, which concerned another dry bulk shipping company, Judge Lane considered different valuation methodologies that relied on, among other things, projected charter rates. Judge Lane rejected an attempt to adopt a discounted cash flow valuation, recognizing the inherent volatility and unreliability of projecting charter rates and further explaining that "[t]his unpredictability in rates is consistent with the credible evidence at trial that the dry bulk market is highly fragmented, with low barriers to entry, and affords market participants little, if any, opportunity to differentiate themselves. Coleman Decl. ¶¶ 16-17. Little if any of that evidence was disputed." *See In re Genco Shipping & Trading Ltd, et al.*, 513 B.R. at 255.

[12] *See In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 459 (Bankr. S.D.N.Y. 1985) (coupled with sustaining postpetition losses, failure to file a plan six months into a chapter 11 case "clearly" shows that there is no reasonable likelihood of rehabilitation under section 1112(b)); *In re Loco Realty Corp.*, No. 09–11785, 2009 WL 2883050, at *7 (Bankr. S.D.N.Y. June 25, 2009) (dismissing case under section 1112(b) where "the uncertainty of the Debtor's cash flow, combined with the questionable ability of the Debtor to make the indeterminate balloon payment, makes any prospect of successful plan speculative at best"); *Canal Place Ltd. P'ship v. Aetna Life. Ins. Co. (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 577 (5th Cir. 1991) (holding that, under section 362(d), debtors must be able to show a reasonable prospect for a successful reorganization within a reasonable time); *In re WGMJR, Inc.*, 435 B.R. 423, 432 (Bankr. S.D. Tex. 2010) (holding that, pursuant to section 362(d), "[t]he question of whether a property is necessary to an effective reorganization depends, in the first instance, on whether the debtor can show a reasonable prospect for a successful reorganization within a reasonable time. The debtor must do more than manifest unsubstantiated hopes for a successful reorganization.") (citation omitted).

11

makes this almost impossible to occur, Mr. Ogle takes all of these assumptions at face value and has no opinion about whether they will come true. Neither he nor the Debtors provide any concrete evidence (really any evidence at all) regarding the assumptions or that this plan is really possible. This is not enough for the Debtors to show a reasonable prospect for a successful reorganization within a reasonable time.[13] Accordingly, the Relief Stay Motion must be granted.

---

[13] The Debtor must present competent evidence regarding its reorganization plan. *See In re First S. Sav. Ass'n*, 820 F.2d 700, 714 (5th Cir. 1987) (holding "[t]here are no assurances that [reorganization] plan would be feasible or confirmable" where "terms are not disclosed"); *In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81, 87 (Bankr. S.D. Ga. 2009) (dismissing petition for lack of good faith where obtaining financing was speculative); *In re Quail Farm, L.L.C.*, 2010 WL 1849867, at *5 (Bankr. N.D. W. Va. May 5, 2010) (holding no reasonable likelihood of rehabilitation where debtor offered only vague "outlines of a plan" that was "short on details," including a "complete lack of specifics as to the size of the loan to be obtained, its proposed terms, and the mode of meeting its obligations based on a viable business plan"); *In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 110 (Bankr. W.D. Tex. 1987) (explaining "[the] court should not . . . be left to speculate about important elements and issues relating to the likelihood of an effective reorganization"); *First Agric. Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.)*, 46 B.R. 892, 902 (Bankr. D. Mass. 1985) (concluding no reasonable probability of reorganization where debtor presented no evidence that buyer was "ready, willing and able to purchase the property

## **CONCLUSION**

WHEREFORE, CMB requests that the Court (i) grant the Lift Stay Motion; and (ii) grant to CMB such other and further relief as is just and proper.

Dated:  May 7, 2015                              Respectfully submitted,

By:  */s/ Timothy A. Davidson II*

ANDREWS KURTH LLP
Timothy A. Davidson II
State Bar No. 24012503
Joseph P. Rovira
State Bar No. 24066008
Andrews Kurth LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile:  (713) 220-4285

-and-

WHITE & CASE LLP
Scott Greissman (pro hac vice motion to be filed)
Douglas P. Baumstein (pro hac vice motion to be filed)
Kimberly A. Haviv (pro hac vice motion to be filed)
Charles R. Koster (admitted pro hac vice)
1155 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 819-8200
*Attorneys for China Merchants Bank Co. Ltd.*

13

HOU:3552791.3

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Reply was served this 7th day of May, 2015 via the Court's ECF system on those parties set up for ECF notice.

By: /s/ *Joseph P. Rovira*
Joseph P. Rovira

14

HOU:3552791.3